Ready to go? Good morning, Your Honors. I'm Daniel Kaplan. I represent the appellant Marlon Moore. And I am going to watch the clock and attempt to save about three minutes for my rebuttal. In Lewis v. Lewis, this Court stated that the third step of a Batson challenge is the real meat of the Batson challenge. This is a case where the real meat of the Batson analysis is simply missing. As the Court is aware, there's a three-step process of a Batson analysis. The first is a prima facie showing of discrimination that's not disputed in this case. Step two, the prosecutor has to articulate a race-neutral justification for the challenged strike. Now, at that step, the justification doesn't even have to be plausible. It can be, I noticed juror 34 had two legs, I believe bipeds favored defendants. That would pass step two. It's only at step three, the real meat of a Batson challenge, that the district court is supposed to undertake what Batson itself identified as a sensitive inquiry into all available circumstantial and direct evidence of discrimination. What did Judge Campbell have done when the prosecutor, in response to his question, why did you strike this guy, he says, because my agent saw him look like he was sleeping. What should Judge Campbell have done? The least I believe Judge Campbell should have done would be to say, I would like to address the case agent, the person, the only person here who allegedly witnessed this juror sleeping. I would like to hear him tell me what he thinks he saw, make an assessment of his credibility by talking to him directly, decide whether the facts he's recounting even sound like somebody sleeping or maybe somebody just resting their eyes, perhaps give counsel a chance to examine or at least ask questions and have the agent address them. That would be the least he could do, because that would at least allow for a relevant credibility determination. On this record, it's only the prosecutor recounting secondhand something she said she heard from the case agent. But there's much more Judge Campbell could have done. In Lewis v. Lewis, this Court describes the fact that there is a toolbox of tools available to a district court. It doesn't have to use every one of the tools, but it has to use enough tools to make a meaningful Step 3 determination. What would another tool be? Another tool would be to look at the actual transcript. There is a point in the record of this trial. What would the transcript show about whether someone was sleeping or not? Unless the reporter, you know, writes down snoring or something. I mean, what's it going to look like in the transcript? Which, by the way, he or she didn't. A transcript could show that Juror 34, when asked to describe the basic biographical information, clearly and lucidly described that information. There was no record that anybody fell asleep. He will stipulate he was awake at that point. But, I mean, how would that bear on whether he had been dozing off some other time? Well, it could show other things pertinent to Abbas in Step 3. For example, we recounted in the brief that there is comparative analysis to be done in this case. There was a strike that was later withdrawn of Juror 19. The justification was Juror 19 was an engineer. Maybe he demands a lot of technical high level of proof. Maybe he won't be impressed with a small number of witnesses. The record already on the transcript, already recorded by that point, would show that there were two other jurors who one of them was a chemistry technician at the nuclear plant. Another one was an intensivist, intensive care doctor, member of the American College of Thoracic Medicine or something to that effect. Those type of comparisons could also be made. And that would also be relevant to Abbas in Step 3 determination. Counsel, in this Abbas challenge, we're reviewing the actions of the district court based on clear error, right? Well, normally, yes. But in a case like this where the court simply fails to make a meaningful Step 3 determination, that's a legal error and that's denoted. Well, I know that's your position that he failed to make an assessment. But the district court did, in fact, indicate the basis on which he allowed the strike, right? Yes, but the basis was a Step 2 basis. It was that's a race neutral justification. Right. And then did he not indicate that based on that he was going to allow it? Yes. And so doesn't that comply with Step 3 then? No, because he's stopping at Step 2. When he says, I'm going to deny the strike, I'm going to deny the challenge, because that's a race neutral justification, what he's saying is the prosecution has satisfied Step 2. I think that's good enough. He never proceeded to Step 3. My view is that he does have to do the comparative analysis. And I guess what I'm struggling with here, counsel, is, of course, as the case is very clear, when you're talking about the demeanor of someone, we have a cold record. We can't see what they look like. We can't see whether they're sleeping. We can't see anything. All we can see is what was written down or occasionally, as my colleague mentioned, if the court reporter says someone's snoring or there's laughter or whatever, we get that. But the fact is we can only review what is seen here. And I'm struggling with why you seem to be requiring more in Step 3 than what the district court did here. Help me with that. Because there's a number of cases that we discussed in the briefs that are similar in the sense of a cold record, as you say. And in those cases, there's not one single one of those cases up to the Supreme Court in the Snyder v. Louisiana that would say we're going to simply defer to a finding that the judge never made. In Snyder, the prosecutor said, I struck that juror because that juror struck me as nervous. The Supreme Court said there's no finding on the record that the judge found the prosecutor's characterization about that juror looking nervous to be credible. Okay, but that's different. Because in this case, the judge did find the representation that the guy was sleeping to be credible. He did not. All he said was it's race neutral, which, again, is Step 2. Well, let me double-check my facts here. Did he not say, I take as a good faith representation from the prosecution team that they saw him putting his head on the bench and appearing not to pay attention? Exactly. Well, okay. Well, he's accepting that as true? No, I would dispute that. He's saying, I'm going to rely upon what I assume to be the good faith of the prosecution team. But he can't make a credibility finding about that assertion that that juror was sleeping without talking to the only person in the courtroom who says he saw the juror sleeping. You would have us interpret, I take as a good faith representation from the prosecution team that they saw him put his head down on the bench and appearing not to pay attention. You would take that as meaning he doesn't believe what they're telling him? I take that as he's taking it on faith. He's relying upon his view of their good faith. Well, he's also in the courtroom. I mean, he didn't come back and say, I don't know what you're talking about. The guy appeared to be hyper-caffeinated to me, or I never took my eyes off the guy, and I never saw him dozing off, or he didn't say anything like that. What he said is, I will take it as, basically, I'll take it as true. Yes. And he's not entitled to do that? No, absolutely not, Your Honor. Okay, suppose we disagree with you about that. What else have you got? We've got a Fourth Amendment issue. Can we talk about that? Sure. Virtually all the evidence that was used against Mr. Moore at this trial was derived from a warrantless, forcible entry into his home. And the justification, the only justification that the government has ever proffered for that warrantless entry into the home, in spite of the Fourth Amendment's, per se, general rule against a warrantless entry into the home, is that consent was obtained from the co-resident. We have to deal with the Randolph case. Exactly. And doesn't Randolph require more than passive inaction? He locked himself in, wouldn't answer the door. People yelled, let us in, let us in. But he didn't say a word. And the Randolph case seemed to be a very narrow exception. What makes this case different? Well, I don't think it's different. I think this case is really on all fours with Randolph. And it is a narrow rule, but this case fits within the rule because here we have a situation similar to the Eighth Circuit case of the United States v. Williams, which involved a hotel room, where the expression of non-consent is not verbal, but it's at least as clear as a verbal expression and arguably even more clear. Counsel, with respect, I guess I don't read Randolph like you do. My understanding is that the co-habitant has to expressly refuse entry. Here you have the girlfriend saying, after considerable discussion, 90 minutes passes, she signs a document permitting this. And your client says nothing. He doesn't come out, doesn't say anything, doesn't object to anything. How does that fit within Randolph? Well, he's in the house, and it's clear on the record that from 2 p.m. when the agents go to the door and there's a marked police car out front, there are agents in the back, they see people peeking out at them, they know the people inside the house are aware that the police are surrounding the house. So from 2 p.m. they know the police are out there. They ring the doorbell. They are trying to gain entry to the house. And nobody comes, Mr. Marlin, Mr. Moore, nor anybody else comes to the door to let them in. So from that point they know they're not consenting to police entry. At that point – Wait, wait, wait. That's not what Randolph says. Randolph says he has to expressly deny entry. So you and I are both familiar with lots of cases where somebody says, you know, get a search warrant, get out. You can't come in here. Nothing like that occurred. He, as you point out, apparently knew they were out there, said nothing, made no objection. His cohabitant, on the other hand, after 90 minutes signed a document agreeing that the house could be entered without a search warrant. Right. So I'm having real trouble seeing how this fits in Randolph. Well, again, I would point to the Williams case. In that case the person was inside of a hotel room. The police announced themselves and asked him to open the door and let them in. And he shut the door and he shot a deadbolt inside the door. And then he tried to – Isn't this case distinguishable? He never had any interaction with the police. He didn't shut the door in their face. He didn't interact with the police. Doesn't that distinguish this case from your Williams case? It's a distinction, but I don't see it as a meaningful one in terms of the underlying basis of Randolph, because the fact is they could not possibly make any mistake that he was not consenting. When they're announcing themselves from 2 p.m., several hours go by. The girlfriend, Ms. Jones, comes to the door. She says, open up. The police are in here. There's a deadbolt. Marlon doesn't open the deadbolt. His expression of nonconsent could not be overlooked or mistaken under those circumstances. Well, he didn't consent, but he didn't refuse to consent either. Wouldn't that be fair to say? I do not agree with that, because if he were not refusing to consent, he would have opened the deadbolt. Well, I mean, he appeared to be content to let his fiancée deal with the police. Well, I don't know if he was content, but he certainly wasn't. So he didn't object. He didn't verbally object. By the time they broke through the door with the battering ram, there was no objection left to make. So from your perspective, silence, instead of denoting consent, denotes objection. And that's the way it should be understood, and that's what you think the Supreme Court meant in Randolph. Absolutely not. It's not silence. It's all the circumstances here. It's the hours of refusing to come to the door. But again, with respect, counsel, Mr. Moore did nothing, overtly or covertly, so far as the record shows, to stop the police from coming in. Nothing. He didn't do anything. What he thought, maybe he was relieved that they were going to come in. I don't know. The record doesn't tell us. But again, as my colleagues have pointed out, in Williams, you have an overt act. You know, block the door. Work with the deadbolt. I get that. That's very clear. There's a physical action that the defendant takes to try to block the police. Your client didn't do anything like that. Just silence. And I don't see in Williams, I don't see in Randolph, where given the consent of the cohabitant, indeed an unusual expressed written signed consent, that Randolph exculpates, not exculpates, but gives your client any kind of relief here under the Fourth Amendment claim. Well, I'm going to have to agree to disagree for now. I'm going to say the balance of my time. Thank you, Mr. Chairman. Good morning. May it please the Court. My name is Theresa Ressas. I represent the United States. I'm from the District of Arizona, and I was trial counsel in this case. The conviction and the judgment in this case should be affirmed. First, as to Batson, Judge Campbell correctly found that as to that third step, the defendant did not meet his burden by showing by a preponderance of the evidence that race was a substantial factor. In fact, Judge Campbell was not persuaded that the government's race-neutral reason was pretextual. And, Your Honor, he made that finding clear when he made the good-faith finding, similar to the Jamerson v. Rummel's case from the Supreme Court in 2013. And he didn't just say, I find in good faith that that's a race-neutral reason. He found in good faith that the fact actually happened, that the veneer person at question, veneer person 34, was in effect not paying attention during jury selection. And, Your Honor, certainly he deserves great deference for that decision. He was the one who was in the courtroom, not only observing the potential jurors and counsel and the defendant, but he had a chance to see the focus of the prosecutor in the case. And in that case, he could see the focus. Kennedy. If you agree, I gather, contrary to your learned opponent, that clear error is the standard of review in this situation. Is that correct? I agree. And I agree that he's due deference, and I disagree that it's a de novo review because there was no procedural error here. In fact, he did analyze the persuasiveness of the government's race-neutral reason. And he did that, having noted that veneer persons 6, 26, 30, 34, 36, and 46, each had issues regarding related to attentiveness or tiredness or inability to focus, all for different reasons, one being a senior citizen used to napping, another somebody with a health issue who grew tired easily. None of those persons served as a juror in this case. So certainly, Judge Campbell deserves great deference in finding that the government's use of its peremptory strike against veneer person 34 for inattentiveness was race-neutral and not pretextual. And I'll remind Your Honors that it was defendants' burden of persuasion at that third step to persuade Judge Campbell that, in fact, that reason was pretextual. And defense counsel did try to do that at the trial level. He tried a side-by-side comparison. It wasn't effective because he wasn't able to do a side-by-side comparison as to the race-neutral reason. If he had tried to do that, obviously, it would have shown that anybody with that race-neutral reason did not serve on the jury. So unless Your Honor has other questions as to Batson, I'll move on to the Fourth Amendment issue. And that's what troubles me here, because it seems that Randolph left an opening where the man, the co-tenant is present. And here was seven hours before they rammed the door in and went in. He did not bolt the door in the face of the police. It was bolted already. And his close fiancé said, sure, you can go in, but it seems to me that there is an opening here if one wishes to argue with Randolph. He was present. He refused to answer. He obviously could hear them. And seven hours he kept the doors bolted. Why shouldn't we assume that although he verbally didn't say, I don't want you in, his actions over that prolonged period of time would have indicated to the police he was not consenting? Your Honor, if this Court chooses to review whether Moore refused consent, it should find there was no plain error, because Randolph's narrow holding requires that he be both present and expressly refuse. Your Honors, we don't know who bolted the door. There were three adults and three children, I believe the oldest being 11 years old. We don't know who bolted the door. We don't know when. What we know is that he failed to act. And I'll sum it in this way. Ms. Jones' request that law enforcement enter her home beats Mr. Moore's non-action. If once Ms. Jones said, yes, please enter my home, and in fact participated in planning the best way to enter, used her own keys, attempted to get into her own Once she made that request, in order for Randolph to be triggered, Mr. Moore needed to do something. He not only needed to be present, which in this case he, we don't know where he was. We don't know if he was upstairs in a room pretending like it wasn't happening with earphones on. We don't know if he stood at the door. But we know he did nothing. And so in order for Ms. Jones' consent to be overruled by Mr. Moore's refusal, he needed to act. And that's clear in Randolph, which is a narrow holding. In fact, the Randolph court purposely made a narrow holding that would be able to be administered by law enforcement. And this court, I hope Your Honors received my 28J letter yesterday, this court in 2009 in the Brown case also read Randolph as a narrow exception to the consent rule. And the Supreme Court did the same thing in 2014 in the Fernandez case, reminding us all that Randolph is a narrow exception to the consent rule. And so, Your Honors, if there are no other questions as to the consent, do Your Honors have any questions on any of the other issues presented in the briefs? I guess not, Ms. Rosas. Thank you very much. Thank you for your time, Your Honors. Thank you. Mr. Kaplan, back to you. Firstly, on the Batson question and the idea that reliance on the good faith of the prosecution team is adequate, again, the district court couldn't make any kind of meaningful assessment of the declarant's good faith, the good faith of the only one who alleged to have seen this, without actually hearing the tale, the story, the facts from him. In Batson itself, the Supreme Court said that if a Batson objection is to be denied on the ground of the prosecutor's protestation or affirmation of his or her good faith, that the equal protection guarantee in this context would become vain and illusory. The idea of relying on good faith is absolutely not from Batson forward an adequate ground. The Third Circuit decision in Coombs, which is in the brief, the Eleventh Circuit decision in McGehee, which is in the brief, very factually similar. The judge said, I'm going to rely on these being responsible good faith lawyers, not adequate under Batson. Counsel, the opposing counsel mentioned that there were a number of other potential jurors, and I'm sorry I didn't write down which ones they were, who were not called, she indicated, because of inattentiveness. I mean, that's not on the record, as far as I know, but should that have any bearing on our view as to whether a comparative analysis would have made any difference in this case? It could have been part of a proper step three analysis if that had been done. It would be pertinent. And there is some of that in the record, juror 26, attentiveness, juror 36, attentiveness. Those are on the record. Quickly, on the Fourth Amendment, the government made reference to plain error. That's not the standard here. There was a motion to suppress that was fully litigated. This is not a plain error Fourth Amendment question. Finally, there was a little flurry of 28-J letters yesterday afternoon. The government cited Brown and Fernandez. I filed a responsive 28-J letter pointing out that the objectors, the persons objecting to the entry in both of those cases, were not present. There is no dispute here. Mr. Moore was present. If there are no questions? I don't think so. Thank you, Mr. Kaplan. Mr. Sosnick, thank you. The case I just argued is submitted. It will stand at recess for today. Thank you.
judges: Nelson, Silverman, Smith